at Ahl. Mr. Orin, am I pronouncing that right? Yes, thank you, Your Honor. So Mr. Orin, you have reserved two minutes for rebuttal, and that gives you then eight minutes to start. So you may proceed. Thank you, Your Honor. May it please the court. My name is Zachary Orin, and I represent plaintiff appellant Colleen T. Puleo in this appeal. This appeal arises out of the district court's grant of summary judgment. And to be clear, we're just appealing one of a number of cases in the district court's grant of summary judgment. Essentially, one of the legal theories, which is the discriminatory discharge claim, for which plaintiff was discharged from her employment that she had been an employer at for 29 years. Now, I understand there's the rule of threes, and being a trial lawyer, you try and follow that. But I really only have two points for Your Honors today. The first is whether or not plaintiff made out a prima facie case of discriminatory discharge. And the second is whether plaintiff met her burden under the third part of the McDonnell-Douglas burden-shifting framework. Well, in the interest of time, why don't we jump to that one? You read my thank you, Your Honor, because I was going to ask you which one you wanted to hear from. So we're going to go to the pretext. So the pretext analysis starts with the first contemporaneous reason given at the time of plaintiff's termination, followed by the two reasons that were then given on the summary judgment motion. So starting with the contemporaneous documentation, which is the termination notice and some emails that were in the record around that time. The employer's position was that the lab was transitioning to essentially small animal research, in particular mice. From that, we go into discovery. We get rule 33 interrogatories in the paper swap. They say the exact same thing, lab restructuring, small animal research. Discovery comes out on the plaintiff, though. And it turns out that she had worked with both large and small animals over her 29 year career at Defendant MMRI. Now, defendant makes a big point that these were going to be genetically modified mice as opposed to normal mice. But it's clear in the record that plaintiff had worked with genetically modified mice. There's C5B11-6 and- I mean, you had to do all of this discovery to uncover that she had worked with them. I take it there was one study and maybe one grant that involved mice. But it doesn't really matter whether she actually worked with mice. It's about whether the employer knew that she had the mice experience, right? Right, and that's a fair point, Your Honor. So in response to that, I would start with the Walsh case. That's a Second Circuit 2016 case. That's the Bricklayer case. And in that case, the Second Circuit found very important that the plaintiff was only asked one technical question during her interview. And from that, the court reasoned that the employer's mind was already made up, because Walsh never got a chance to showcase her credentials. Here is the exact same situation. It's not the exact same thing, right, because they did a posting for the small animal care assistant, and she didn't apply for it. So there wasn't an interview in which they asked her a question. All right, fair point, Your Honor, but in response to that, first, her job was given away to Louis Gunther. Second, we've got to go- I don't know if it was given away, right? So they did a separate posting for a small animal care assistant, and she could have applied, but didn't apply. Maybe you think that they should have given it to her automatically because they should have known about this mice experience. But you admit that it's not clear that they did, and so it's not obvious to me it's a pretext that they thought that they needed somebody to focus on small animals. So if we go to the first job posting for a position that was not given to Louis Gunther, that plaintiff admits she was not qualified, she sent an email to defendant Contaris and asked if she needed to apply for this job posting. Contaris responds in an email, on the different job, I think you are great and will continue to be a valuable asset at the laboratory in any capacity. My hope is that you will continue at MMRI for many years to come. I hope this relieves some of your concerns, and I am happy to chat by phone. You should have any additional questions, concerns regarding this or your current position at the lab. That's 8127. What does any of that have to, I guess I'm trying to figure out, what does any of that have to do with pretext or supporting an inference that this was actually a gender or age based determination? And my response is that lulled plaintiff into a false sense of security. Well, no, you could, all right, but what is the basis for thinking? I mean, I think this is a straightforward question. What in the record is there to support the inference that there was a gender or age based reason for not hiring her or terminating her? That gets into the prima facie case. No, no, no, I mean, that's at step three. You're going to have to show that the stated reason was a pretext and the real reason was gender or age discrimination. And, right, and my basis for that is primarily from 2016 to 2018, there were six females terminated, older females terminated, and no other employees were terminated. And that was all related. They were allegedly terminated by Mr., I'm not sure I'm going to pronounce the name correctly. Melinsky, and there were explanations given for each. And one of the things the trial court noted was that in her own deposition, your client, when asked, why do you think he acted this way towards you? She said, I have no idea. She didn't say, I think he did it because I'm a woman or because of my age. So that's part of the problem is that the other women that were let go, there were other reasons. One was a breach of lab confidentiality or privacy, so what's your evidence that this was gender and age based? So a couple of follow up responses to that. First of all, as far as that deposition question, your honor, I reviewed that in the record. And the way the question was posed, my client was being asked to speculate as to the defendants of Lewinsky's state of mind. If that was a trial situation, I absolutely would have stood up and injected on the grounds of speculation. However, deposition, all objections are withheld as to form, so there couldn't be objection lodged there. So my- I get that, but her response would have been, I don't know. Or her response could have been, the only reason is because I'm a woman. And he discriminated against women. There were other women he fired, but she didn't say that. No, but it is clear in the record that she had been under the employee of the employer for 29 years. And there was not a problem with her job performance until he was hired in 2016. Then all of a sudden, and I spent a lot of time in the statement of facts laying this out from pages 12 to 18. But he stopped being her supervisor, right? She didn't report to him. There was discovery around the issue of whether, who made the decision to terminate her and that he was not involved at all. Do you have evidence that he was involved in her termination? Well, yes. First of all, directly Zelinsky and Contreras were both directors, or officials of MMRI, which under the Holcomb case, that's a 2008 Second Circuit case. That's enough to bind them. Secondly, I do raise the issue of Katzpah liability. That was not brought up in the district court briefing. It definitely was brought up after reading the district court's decision. And in that, Zelinsky had the write-ups. They were in plaintiff's personnel file, including her removal from the IACU committee, which happened after she was no longer her immediate supervisor. And it is clear in the record that Contreras did review that personnel file, which I would submit establishes Katzpah liability. But so why does it matter? So you're saying the reason you could show it's a pretext is because there was this pattern of dismissing, or a number of women had been dismissed. But isn't that really your prima facie case? Maybe that allows a basic inference that maybe there's discrimination. But once the employer comes forward with a legitimate reason for the termination, that presumption drops out. And you have to show that the reason is false and is a pretext for discrimination. The fact that they dismissed other women doesn't show that they did not care about the small animal, large animal distinction, right? I mean, in fact, the letter that you just quoted from Contreras, it begins by saying the director for animal research position will be a new and different role from your current position as large animal care administrator. Which principally coordinates the dedicated care of the large animals. And it's true, she says, I expect that role to continue, but you know, it's not illegal for their plans to change. What's illegal is discrimination based on sex. And isn't this a contemporaneous document saying they did view her as the large animal care administrator? And that would be a different role from the small animal care. So a couple things, your honor. That was not the job she applied for. The job she applied for was posted and nobody told her about it. There's no evidence to the record that she was aware for it. Within six days of that posting, they were already talking about giving that job to Louis Gunther. Moreover, that job posting never mentions mice, genetically altered mice, small animals, or breeding. And Louis Gunther, who was awarded it, in his resume that he submitted to the employer, never lists mice, genetically altered mice, small animals, or breeding. That shows an absolute pretext that they did not care about these traits at the time of the job posting. I mean, so I get your point that it's not specifically mentioned in the posting. But don't we have contemporaneous documentation that they did care about the transition to mice? When they're evaluating this application and then when they're talking about the small animal vivarium and all of the transition. In fact, when you began this argument said that you got documents showing that that's what they were thinking about contemporaneously. And ultimately, if you see in the record and it's briefed, they transitioned to a small and large animal position so much so that they hired for both small and large animal care administrators ultimately. So I see- Years later, you're saying? Not years later, no. The contemporaneous documentation cited in the record at the time of her employment shows that they were still considering the build out of both. The build out of both does get completed. And that gets into whether or not- The large animal reintroduction takes longer than they originally expected. That much I will concede, yes. Okay, so then you're saying the record shows contemporaneously they did regard large animal care differently from small animal care. And they viewed her as the large animal care person. And their initial plans to have a large animal care vivarium on the other side of the renovation turned out to take longer than expected. And so at that moment, they didn't have the need to keep on a large animal care administrator. That's supported by the record. Yeah, but I would disagree on the law that they were entitled to disregard her potentials in small animal care. Again, I think I've already touched on that, but that- Is there any, I mean, I asked you before whether they knew that she had this experience with small animal care, and you said that was a good point. I mean, is there anything in the record where they said, well, yes, she has experience with mice and the kind of mice we're going to work with, but we don't like her for some other reason. Well, my point is, as it gets back to the Bernie case, where she never had a chance to showcase- It's a simple question. Is there anything to indicate that the folks who made the employment decision were aware of her experience with mice? Yes, because defendant Corowan has testified that she did review plaintiff's personnel record. All right, so you reserved two minutes for rebuttal, Mr. Oren, so we'll get back to you. But we'll first hear from Ms. Redmond on behalf of the defendants, or the appellees. Thank you, and good morning, your honors. May it please the court. My name is Hannah Redmond from Bonchanigan King, counsel for defendant appellees, MMRI, Maria Contreras, and John Zielinski. Today, we ask this court to affirm the district court's decision and order, which correctly granted defendant's motion for summary judgment. As plaintiff abandoned her retaliation claim, the only question before this court is whether plaintiff was discriminatorily discharged because of her sex or her age. Based on the record before you, the answer to that question must be no. As discussed thus far, plaintiff cannot point to anything in the record that indicates that her age or her sex played any role in the decision to terminate her decision. She asks this court to reverse the decision below, based not on evidence of discriminatory conduct or material issues of fact, but her say so. As set forth in defendant's brief, plaintiff was terminated because she was not qualified for any of the post-renovation animal care positions available at MMRI, and because of a lack of funding for her temporary research assistant position. Is that sort of a fact, might that not be a fact question? So it's true that there's this distinction between large animals and small animals, but it's not totally obvious that that was crucial to the new job posting, because it's not even mentioned in the job posting, and it's not obvious that she only worked with large animals because she has this experience with mice, so why couldn't a jury infer that that is just a kind of, that that is a pretext? For a few reasons. That distinction was not so important in that it's a pretextual explanation for going to fire her. For a few reasons, your honor. First, Maria Contreras, the sole decision maker in this case, had absolutely no knowledge of plaintiff's experience working with mice. It was her understanding based on her familiarity with MMRI that large animals, primarily pigs and dogs, had been used for research in the years preceding her arrival to MMRI in late 2017, early 2018. Second, we have the benefit of hindsight here. It's indisputable that genetically modified mice were primarily used from 2018 forward. The large animal space was eventually constructed. It was not complete until December of 2020, and still yet, it was not until September of 2021 that a few pigs were on site for the limited purpose of demonstrating how to conduct a large animal research study. So we have here nearly five years between 2017 and late 2021 where we're only using genetically modified mice at MMRI. Turning to the job description itself, the fact that the words small animal mice, genetically modified mice aren't apparent from the face of the job description, I like to think about this the way we think about FLSA classification issues, where the job description is not determinative. It's what the person is actually doing in the job. One of the claims Ms. Puglio made was that she was not made aware that this position was posted until after she was terminated. The position, of course, that she claims went to Mr. Gunter, rather than her, that she was qualified for. Is there anything in the record to indicate that we can look to how this position was posted? The position was posted on... I'm not asking you for information outside of the record, but within the record, how was it posted? Yes, so Dr. Contaridis addressed this during her deposition. She verbally made a plaintiff aware that this was a job opportunity that was opening for the small animal, pardon me, it was not technically called small animal, but for the animal care assistant position, which due to the nature of the animals on site was small animal care assistant. I'm sorry, who did you say testified? Dr. Contaridis testified about her verbal conversation with plaintiff.  While we can see that there is- The position, of course, went to her husband? Went, no, Dr. Contaridis is the director of research. Sarah Contaridis was hired for the- Sarah Gwinther. Sarah Gwinther, thank you, was hired for the manager of animal care facilities. Her husband was hired for the assistant position. So Dr. Contaridis testified that plaintiff was, in fact, made aware of this position. And while plaintiff disputes that, it's not a material dispute because of defendant's understanding about plaintiff's lack of understanding, lack of experience with the small animals and genetically modified mice that were going to be used for scientific purposes. Why is it a material dispute, right? So we have a job posting that went up, possibly without her knowledge, to advertise for basically her job. And your client's argument is, well, it's because we really cared about the distinction between small mice and- Or sorry, small animals and large animals. But that wasn't in the job posting. And if you had reviewed her personnel file, you would have seen experience with small animals. And they did review her personnel file. So why couldn't a jury conclude, well, you know, you surreptitiously put up this other posting in order to replace her with somebody else? So I'll first note that the personnel file is not in the record. And it does not reveal any- it's not in the record. I mean, so I won't represent what it does or does not reveal. But there's nothing in the record aside from plaintiff's representations that in 2006, 2004, and 2012, she had some very limited work with mice. So to say that based on those very niche references to plaintiff's- But why is that also a fact question? So if she says she had experience with mice and it would be reflected in the personnel rec- her personnel file, and the record does reflect that her employer reviewed the personnel file, maybe it is a question as to whether they would have known about that experience by reviewing it. Respectfully, Your Honor, there's nothing in the record that shows Dr. Contreras did have any familiarity with plaintiff's alleged experience working with mice. And even if Dr. Contreras was mistaken, let's assume plaintiff did not know about the job posting and did in fact have some very minor experience years before Dr. Contreras was on site and working for MMRI. And Dr. Contreras operated under a mistaken belief that plaintiff did not have the requisite experience, that still is not evidence of discrimination. There's still nothing indicating that it was her sex or her age that motivated the decision to hire Lewis instead of plaintiff for this small animal care assistance. That's true, but would it be enough to infer that maybe there is sex or age discrimination going on if we think a jury could infer that the employer reviewed the personnel file, knew that she had experience working with small animals, and then nevertheless hired somebody separately under the pretense of saying that that person was going to work with small rather than large animals? Even under that theory, plaintiff is left with nothing other than the fact that a person outside of her protected category was hired for the animal care assistant position and ultimately while that might be enough to carry her very low burden on a prima facie claim at the pretext stage, that is not enough. And this court addressed a similar issue in Carter v. TB Bank in this year of, in June of 2024, essentially finding that even if it's enough to say somebody outside of my protected class was hired for the position or was my replacement, that may be enough at the prima facie stage, but it is not at the pretext stage. Well, step three is a pretext for discrimination, not just what they say. Step two, the employer states a non-discriminatory reason. Once they've done that, then it goes to step three. And then the plaintiff gets to say, well, that's a pretext, and it's a pretext for discrimination. But here, I guess what we've been asking Mr. Oren about was what is there that supports discrimination? And his points are that other women were fired and that the person who got at least one of the jobs that she would have wanted was a man and otherwise younger than she, right? Correct. So why is that not enough? So on the first point that other women were fired, the record reflects that it is only John Zielinski who was alleged as being involved in those terminations. Here, there is not any evidence that John Zielinski played a single role in plaintiff's termination. There's undisputed testimony from Dr. Contreras, John Zielinski, David Schneeweiss, and Amy Pietrafesa on this point. When asked at her own deposition whether a plaintiff was aware of anyone other than Dr. Contreras who was involved in her termination, she had to concede no. There is absolutely no evidence that John Zielinski, the only person alleged to have any discriminatory- Well, she's not aware of it, but he is the director of administration of the facility. Is it not plausible that he had some input into an employment decision? Not given the testimony that's in the record from all of the participants who have said that he had no role. Him having the authority is distinct from him having exercised that authority. In this case, the sole decision-maker was Dr. Contreras who, like plaintiff, is a female older than 40. I mean, there is that email that he sent after the harassment allegation when he says, I didn't lay her off. I did not lay Colleen off so she could support the scientists and there would be no excuse for failure to properly submit and hopefully win grants. We'll see what develops. Is that not evidence that he was thinking about firing her before and is on thin ice with her and might fire her in the future? It's not. So there was some testimony from John Zielinski about this and it's included in his declaration as well. That email refers to the decision to keep the plaintiff employed from mid-2017 when the animals were no longer on site at MMRI. MMRI had no position for plaintiff at that time because her job was primarily to care for the animals. There were no animals. And so instead of terminating her at that point, they looked for alternative work for  And that was John Zielinski's decision. He said, where can we possibly use her on a temporary basis while we construct these new animal spaces? And so he was instrumental in moving her to a temporary research assistant position. And that decision alone indicates he had no animus against plaintiff because of her age or her sex. John Zielinski also hired Maria Contrer. I don't know if it does because the email does suggest that even though he kept her on, he wasn't sure it was right and he thought about laying her off and he's not sure he's going to keep her. I mean, doesn't it seem like he's equivocal about whether it was the right decision? Even if that's the case, Your Honor, there's no evidence that there was an age or sex-related rationale. Him saying, in hindsight, maybe she's not suited for the Institute has nothing to do with her protected characteristics. Well, yeah, but he is the one who has this pattern of firing the four other women and nobody else in the immediately preceding period, right? Your Honor, the pattern is taken out of context. Plaintiff admitted that she has no familiarity with the circumstances under which any of those women were terminated. The record reflects that there were legitimate non-discriminatory reasons for each of those terminations, including two of the women having breached confidentiality expectations. And so just to point to this statistically insignificant number of a few women who were terminated. How do we know it's statistically insignificant? There's not a lot in the record to indicate five or four out of how many? Fair point, Your Honor. I don't believe the record reflects the total number of employees. I think four or five women of eight who separated during the relevant time period. Out of a workforce of how many? I do not have that number, Your Honor. But even so, so we're still talking about John Zielinski. He had nothing to do with plaintiff's termination. And so he... I'm not saying he had nothing to do with the termination because the defendants here testified that he didn't. But we do have an email that showed, and you just acknowledged that at one point he did control whether she would be employed or not employed. And you're just saying, well, by the time of this decision, he had no influence at all in the employment decision. But they dispute that, right? And it might be plausible because it's undisputed that at one point he did get to decide whether she was employed. They dispute that based on no record evidence, Your Honors. John Zielinski made the determination in mid-2017 before Dr. Contaridis was hired as the director of research. And there's undisputed testimony that by the time Dr. Contaridis was onboarded at MRI, it was her who was making the decisions. But just so I'm clear, that's for both the positions? That's for the... The manager? Both animal care positions? Both, no. It's for the animal care position and the temporary assistant. In other words, Zielinski had no involvement with either of those. Correct. It was Dr. Contaridis who made the decision to terminate plaintiff for both of the reasons that defendants have proffered. Even though there's an email that basically he says, well, can we find something for her temporary, right? Nine months earlier, yes. Okay. Well, thank you very much. Thank you, Your Honors. Well, now here's Mr. Oren for two minutes of rebuttal. Thank you, Your Honor. May it please the court. First of all, there was a lot of questioning in the record as to the disputed fact of plaintiff's knowledge of the job posting. I would direct Your Honors to A-1326. That makes clear that plaintiff disputes the fact that Dr. Contaridis ever told her about the job posting and that she was not aware of it. Second, we heard a lot of questions about the inexorable zero. That's the Wall Second Circuit 2016 case. The statistical proof is, what we would call it, it's six older women were fired during this 2016-2018 time period, but no men, young or old, were terminated. That's A-1783 to 1784. And finally, I do- But we don't know the composition of the workforce as a whole. In other words, if it's 90% women or 99% women, then that's less compelling than if it's 50-50, right? Correct, Your Honor, that- You don't have anything like that. No, you don't have those kinds of statistics. And I'll admit, it is not a class action. The phrase inexorable zero comes from cases where an employer has built out an entire workforce that has no minorities or no women, right? Like, that's the kind of circumstance where we say inexorable zero is very significant. I mean, here you're just talking about the handful of people that were fired in an immediately preceding period, but it's not the case that this lab only had male employees or something to that effect, right? One of the other research assistants was a woman. The president of the whole thing is a woman who's over 40. Like, it's not, this is not an inexorable zero case. Correct, but Walsh does say that, and that's the second 2016 case, that an individual plaintiff can use an inexorable zero as part of her prima facie case, and we couple that with other areas of proof. And finally, honors, I see I'm almost out of time. I do want to direct your attention to, in my brief, that there was a second reason invented at summary judgment level for plaintiff's termination, the lack of funding. I briefed it. That alone is enough to defeat pretext. That's the Ethan Allen case. I can see I'm out of time. Unless your honors have any further inquiry, I have nothing further. Well, let me just follow up on that briefly, because there were two people who were hired as temporary assistants, right? Yeah, Mr. and Mrs. Gunther. Right, so one's a man and one's a woman. Correct. Right, so how does that support an inference of gender discrimination? Well, that piece of evidence, viewed in isolation, that would obviously be something the jury could weigh against the plaintiff. Why would they weigh? How does it support an inference that this was gender-based discrimination? Because Zielinski was only terminating the female employees. I believe the L- But he hired a female employee for one of the temporary positions. Sure. And I think if you look in the record, your honor, you will see Dr. Corintaris was the one that hired Mrs. Gunther. Right. So? So, and our theory of the case is that essentially, for lack of a better word, the bad actor is defendant Zielinski. So it's his pattern and practice that- What's the evidence that Zielinski made the hiring or firing decision? Well, that gets into what we just discussed with the Katz-Paul liability, the Holcomb, his prior supervision of plaintiffs, putting the write-ups in our personnel file that ultimately tainted her view. Thank you, your honor. Well, thank you, Mr. Oren. Thank you, Ms. Redman. We will reserve decision.